## The County of Armstrong *versus* Brinton.

*Holder of county bonds issued in payment of subscription to railroad stock, limited in demand to the sum paid by first purchaser.—Form of proceeding against holder.*

1. Where bonds, issued by a county in payment of its subscription to the stock of a railroad company, were sold below par, in violation of the statute authorizing their issue, the county may, by proceeding in equity, compel the holder to receive in satisfaction of the bonds the sum paid by the first purchaser with interest thereon.

2. In such a proceeding against a holder who was the original purchaser, it is not necessary to make the railroad company a party defendant.

3. The suggestion as to the proper course to be taken by counties in such cases, made in Thomas's Case, 8 Casey 230, and repeated in Diamond *v.* Lawrence County, 1 Wright 358, reaffirmed.

APPEAL from the Common Pleas of *Chester county*, sitting in Equity.

This was a bill in equity, filed in the Court of Common Pleas of Chester county, in which the County of Armstrong was complainant, and George Brinton respondent.

The bill set forth, That by an Act of Assembly, approved 4th of April 1837, the governor was empowered to incorporate the Pittsburgh, Kittanning and Warren Railroad Company, with power to construct a railroad from Pittsburgh by way of Kittanning to the town of Warren, in Warren county, Pennsylvania.

That by a supplement to the Act of 1837, passed the 14th of April 1852, the name of the said railroad company was changed from The Pittsburgh, Kittanning and Warren Railroad Company to that of The Allegheny Valley Railroad Company.

That in pursuance of the Act of 1837, and the supplement of 1852, a charter of incorporation was issued to said company in the year 1852, in pursuance of which said company had constructed a railroad from Pittsburgh to Kittanning, a distance of forty-four miles, and was operating and using the same.

That by the 3d section of the supplement of 1852, the county of Armstrong, *inter alia*, was authorized to subscribe to the capital stock of the Allegheny Valley Railroad Company, any sum not exceeding 10 per cent. of the assessed valuation of said county. The amount of said subscription to be first fixed and determined by one grand jury of said county, with the proviso, that whenever the bonds of said county were given in payment of such subscription, the same shall not be sold by said railroad company at less than par value.

That on the 23d day of September 1852, Hon. William F. Johnston, as president of the Allegheny Valley Railroad Company, presented a petition to the grand jury of Armstrong

[County of Armstrong *v.* Brinton.]

county, requesting a subscription from said county, to the capital stock of said company, to the amount of $150,000, and stipulating in his said petition that "the said railroad company would agree in writing with the commissioners of said county, to pay from the treasury of said company the interest on all bonds which might be issued in payment of said subscription, until the dividends arising from the profits of said railroad would be sufficient to pay said interest."

That on the 23d of September 1852, the grand jury of said county did recommend a subscription of $150,000 to the capital stock of said company, "upon the terms and conditions set forth in the petition of the president of the company, and the laws of this Commonwealth then existing and governing the same." That in pursuance of the action of the grand jury, the subscription was made of the sum of $150,000 by the commissioners of said county, upon the terms, restrictions, and conditions aforesaid, and one hundred and fifty bonds of said county issued in payment thereof, each calling for $1000, with coupons annexed, providing for the payment of 6 per cent. interest, payable semi-annually on the first Mondays of May and November of each year, at the office of the railroad company in the city of New York, all of said bonds bearing date May 2d 1853, payable thirty years from date.

That said bonds were issued upon the faith of the laws prohibiting their sale at less than their par value, and upon the express condition contained in the petition of the railroad company as presented to the grand jury of said county, which said condition was embodied in a legal and binding contract with the president and managers of said railroad company before said bonds were delivered, and that the Act of Assembly prohibiting the sale at less than par was expressly referred to on the face of each and every bond so as aforesaid issued.

That the said railroad company had from the beginning failed and refused to pay the interest on said bonds, and is now, and has been for a long period, wholly insolvent and unable as well as unwilling to comply with their contract to pay the interest on said bonds, and that all the property, rolling stock, and franchises of said company are covered by a mortgage for a greater amount than their value.

That the said railroad company, in violation of its contract, and of the Act of Assembly under and in pursuance of which said bonds were issued, sold thirty of said bonds and coupons attached, at public auction in the city of Philadelphia, on the 13th of July 1858, at thirty-seven cents on the dollar, or sixty-three cents on each dollar below their par value, and that at said sale the county of Armstrong gave written notice to bidders and others of the terms and conditions upon which said bonds

were issued, and the defence of the said county to the payment of the same.

That at said sale on the 13th day of July 1858, George Brinton, the defendant, "well knowing the terms and conditions upon which said bonds were issued and with full knowledge of the law regulating the sale thereof, and the notice aforesaid, and in violation of the said law and contract, did purchase and now holds twenty-nine of said bonds and coupons, to wit: Numbers 18, 19, 20, 21, 22, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, and 49, at the rate of thirty-seven cents on each dollar, or sixty-three cents on each dollar below the par value thereof, and is now demanding and seeking to recover from said county the full interest on $29,000, the face of said bonds, and further claims to recover the full amount of said bonds, to wit, $29,000, when the same shall mature and be due and payable.

That although the complainant is advised and believes that said county is in nowise liable or responsible for any part of the principal or interest of said bonds thus illegally held by George Brinton, yet for the purpose of compromise and preventing litigation, said county had proposed and offered in writing, to pay said defendant in cash, from the county treasury, the interest on the money expended by him in the purchase of said bonds from the date of such expenditure, and further to execute and deliver to him a new security upon said county, in such form as said defendant or his counsel might elect, for the amount of money so as aforesaid by him expended in the purchase of said bonds, maturing at the same time at which the original bonds would have matured, and with coupons attached, securing the prompt payment of the future interest in the same manner as the coupons to the original bonds secured the same, and to that end said complainant would procure at her own expense whatever legislation might be necessary, in the opinion of the defendant or his counsel, to render binding and obligatory such new bonds and coupons. But which said offer, on the part of said county, had been rejected and refused by said George Brinton.

And praying for an injunction to restrain the transfer or negotiation of the bonds and coupons.

A decree against George Brinton to compel him to surrender to the complainant the bonds and coupons without receiving any compensation therefor; or

A decree against George Brinton to compel him to surrender and deliver up to complainant the said bonds and coupons, upon the compliance by complainant with the offer to pay in cash the accrued interest and execute and deliver a new security according to the offer recited in said bill, or upon such other terms and conditions as the court might deem equitable and just.

[County of Armstrong *v.* Brinton.]

And for such other and further relief in the premises as the nature of the case might require, and to the court might seem meet.

To this a demurrer was filed by the defendant. On argument, the court dismissed the bill, for the reason that the relief prayed for could not be granted; which was the error assigned.

*Edward S. Golden* (with whom were *P. Frazer Smith* and *James B. Neale*), for appellant.

*F. Carroll Brewster*, for appellee.

The opinion of the court was delivered, May 26th 1854, by

WOODWARD, C. J.—In Thomas's Case, 8 Casey 230, we intimated that when a county found itself pursued by the holders of county bonds, issued for the stock of insolvent railroad companies, and sold at ruinous rates, in violation of the statute which authorized the bonds to be issued, the true and honest course for the county was, not to repudiate the debt, but to bring the purchasers of the bonds into a court of equity, and compel them to receive in satisfaction of their bonds what had been actually paid for them. In the case of Diamond *v.* Lawrence County, 1 Wright 358, we repeated, amplified, and defended the above suggestion, but we alluded to the fact that no county had yet thought fit to act upon it.

At last a county has brought a bondholder into equity in pursuance of our suggestion. The County of Armstrong complains that the president of the Allegheny Valley Railroad Company obtained in 1853 a county subscription of one hundred and fifty thousand dollars to the capital stock of his company, for which the county issued bonds under the corporate seal of the county, to the company, in pursuance of the Act of Assembly of 14th April 1852, he, the said president, stipulating in writing, before the bonds were issued, that the said company would pay the interest on the said bonds until such times as the dividends arising from the profits of said road may be sufficient for that purpose. It is shown, further, that the Act of Assembly which legalized these bonds provided that they should not be sold by the railroad company at less than par value. It is then alleged that the company is insolvent, that it has wholly failed to pay interest according to the agreement, and that on the 13th July 1858, they exposed to public sale in the city of Philadelphia, and sold to the defendant twenty-nine of the said bonds of the par value of one thousand dollars each, at the rate of thirty-seven cents in the dollar, and sixty-three cents on each dollar below the par value thereof. A written notice was read at said sale, notifying all persons that the bonds were issued upon certain positive terms

[County of Armstrong v. Brinton.]

and conditions which the company had failed to comply with, whereby their right to the bonds had been since forfeited; that the bonds were issued without authority, and negotiated contrary to the agreement of the company, and would be resisted by the county. It is further alleged that for the purpose of "compromise and saving litigation, your orator has proposed and offered in writing to the said defendant, to pay him in cash, from the treasury of said county, the interest upon the money expended by him in the purchase of said bonds, from the date of the expenditure thereof, and further to execute and deliver to him a new security upon the county of Armstrong, in the form of one or more bonds, as said defendant or his counsel might elect," which offer has been declined.

Such is, in substance, the case made by the bill. The prayers are, 1st. That the court would decree the delivery and cancellation of the defendant's bonds; 2d. Or that defendant may be compelled to surrender his bonds on the county's complying with their offer as above stated; 3d. That he may be enjoined against selling or transferring the bonds; and, 4th. For general relief.

The defendant demurred, and assigned eight causes of demurrer, the first and fourth of which denies the plaintiff's equities on the ground that the bonds were negotiable, and not subject in the hands of a *bonâ fide* purchaser to any equities between the original parties. These objections raise the essential question in the cause. Let us first attend to it, and then notice, in due order, the minor questions.

We need not to be reminded of the doctrine of the commercial law, that whoever issues a negotiable security for money is bound to make it good, in whose hands soever it may have come in due course of business, and for a valuable consideration, and that he cannot excuse himself from this duty on account of equities, however unquestionable, which exist between him and the original promissee. We acknowledge and accept this principle. It sprung from the necessities of trade and commerce, and it has grown into universal law by the consent of mankind. Like all other great principles, its progress has been attended with many sacrifices of particular rights, but these have not been too dear a price to pay for it, and if it were necessary for its maintenance and vindication, to bring within it the *sealed* securities which communities of our citizens issued under peculiar circumstances that can never again occur, we would not hesitate a moment to compel the sacrifice, remembering thankfully that often, if not always, partial evil is universal good. But it is neither necessary nor proper.

Bonds like these are of modern invention, and when counties and towns were decoyed into the use of them for purposes of railroad corporations, they had to obtain enabling statutes before

[County of Armstrong *v.* Brinton.]

they could prostitute municipal seals to any such purpose. And as soon as the people began to *feel* the consequences of applying the fundamental principle of commercial paper to their bonds, they altered their organic law so as to render such bonds and enabling statutes impossibilities in the future. This class of securities, therefore, are not going to enter into the general commerce of the world. They were thrown off in a spasmodic action of the public mind, and courts of justice will have to deal with only so many as were issued whilst the spasm lasted. Why should we insist on applying the commercial law to such anomolous, temporary, ill-judged, and unwholesome securities? Is it from tenderness towards innocent purchasers? We have on this record a purchaser at 63 per cent. discount, as innocent as most speculators in such bonds, and how did he buy? The notice of 13th July 1858 was very unskilfully drawn, but still it was enough to put Mr. Brinton upon inquiry into the source and origin of the bonds, and if it would not have led him to the truth, there was the whole statute plainly referred to on the very face of the bonds themselves, which told him they were not to be sold under par. It is in vain to say that the rule of the statute was inapplicable to the bonds, for without that statute the bonds had no lawful existence or value. Mr. Brinton took them, necessarily, under and by virtue of the statute, and therefore he took them with notice of the condition that the company had no right to part with them at less than their par value. No fictitious presumptions and intendments ought to prevail against the plain truth of the transaction. The defendant knew that he was buying a statutory security at a rate which the statute forbade. Had he gone into the market and bought commercial paper he could not have been affected with similar notice, for commercial paper is not issued under the sanction of statutes, but according to the demands of business.

But how is it that courts of justice insist on not knowing the truth of the transaction, from deference to purchasers, whilst no regard is paid to the rights of the tax-payers who have been made responsible for the bonds? Why are the people of Armstrong county to be treated as so many merchants, issuing commercial paper, which they are bound to redeem to the uttermost farthing? Why not regard them, like the purchasers of their bonds, in the light of truth? They elected agents who issued the bonds under the sanction of a statute. We lay out of the account all undue influences, if any, that were exerted upon the people's agents, and hold the constituents liable for all the consequences of the act of their representatives. The bonds were issued, and in similar cases we have held them valid. They went into the hands of the railroad company, and were exchanged for so much money. The people of Armstrong county induced Mr. Brinton to pay into the treasury of the company thirty-seven

[County of Armstrong *v.* Brinton.]

dollars for every hundred dollars of bonds he holds.  No matter how unfairly they may have been dealt with by the railroad company or their own agents, this is the extent and scope of their act, and they are responsible for the full measure of it.  But to make them responsible beyond this, is to fabricate a fictitious liability out of principles of the commercial law that are sound and valuable in their proper application, but pernicious and unjust when applied, as the argument strives to apply them, to these sealed instruments.  Yet in giving to the holder the moneys which the company received for the bonds, we do recognise a qualified negotiability in them, for the holder may have paid much less than the first purchaser from the company.  Such, however, was not the case here, for Brinton was the first purchaser from the company.  For other observations on the negotiability of such bonds, I refer to what was said in Diamond's Case, 1 Wright 358.

Standing firmly on the ground taken here, and in that case, we feel no disposition to recede from the very thoughtful suggestion first thrown out in Thomas's Case, and which brought these present parties into a court of equity.  No adequate redress can be had at law.  The history of the Allegheny county bonds is melancholy proof of this assertion.  Whether proceedings at law on the part of Mr. Brinton would drive the people of Armstrong into repudiation, after the evil example of Allegheny county, we have no authority to say, but that litigation would be expensive, vexatious, and inadequate is unquestionable.  As to any defence at law on behalf of the county, the rulings in the *mandamus* cases in Allegheny county show that it would be impossible.  A failure of legal defences to municipal bonds is not, however, equivalent to their collection—a truth which the experience of this court abundantly attests.

Unless, therefore, courts of equity apply their plastic powers to cases of this sort, I see not how they are to be dealt with without doing more mischief than we remedy.  Judges will never convince tax-payers that the law requires one hundred dollars to be returned for thirty-seven loaned.  No reasonings in behalf of innocent purchasers of what is, inaccurately, called commercial paper, will ever so penetrate the popular mind as to persuade it that railroad bonds ought to be redeemed at twice or thrice their first cost.  All attempts at such an administration of legal principles have proved, and will continue to prove, abortive.  But how can courts of equity deal with the subject?  I answer, by coming at once to the truth of the matter, and compelling the counties to repay the money which the bonds actually brought to the railroad companies.  The intent and purpose of issuing the bonds are always to put money into the treasury of the company.  Let them be enforced to the extent of the money they

[County of Armstrong *v.* Brinton.]

brought, and the popular mind will at once recognise the reason and justice of such a decree. And nobody will be hurt. Communities will generally be able to stand under such burthens, and public morality will not be debauched by schemes of repudiation, whilst the bondholders will get back their money and its interest to invest in new securities, which are, what these bonds are not, strictly negotiable in the mercantile sense of that word.

But here some technical difficulties arise. We cannot, as a court of equity, compel the parties to make a new bargain, for that would be to make a bargain for them. The terms which have been offered to Mr. Brinton we deem altogether equitable and just, but we can compel him to accept them only by restraining him from pursuing his legal remedies. Cases often arise, says Judge Story, 2d Equity, § 904, in which a party may be entitled to proceed in a suit at law for damages, when a complete equitable defence exists, which is yet incapable of being asserted at law. In such cases the suit at law is treated as vexatious, and will be stayed by injunction. We think the court below ought to have enjoined against a sale or transfer of the bonds or the coupons attached to them, and against all actions and suits for the recovery of either of them, on condition that the plaintiff pay the overdue coupons at the rate of six per cent. on the sums the defendant paid for the bonds, and pay the future coupons at the same rate regularly as they fall due, and the principal at the rate of thirty-seven cents in the dollar when it falls due. Under the operation of such an injunction, the parties would probably make a new bargain for themselves. As Mr. Brinton was the first purchaser from the company, the rate at which he bought should be the basis of the decree.

Another technical difficulty suggested by the third cause of demurrer is, that the railroad company is not made a party defendant. If Brinton had not been the first purchaser of the bonds, it would have been highly proper, and perhaps indispensably necessary, to bring in the company to show at what rate they parted with the bonds; for, according to our principle of decision, the holder would be entitled to receive so much on his bonds as they produced to the company for whose benefit they were made. But here the defendant admits by his demurrer that he was the first purchaser at 63 per cent. discount, and it is not necessary for that reason to bring in the company. Again, if we were declaring the invalidity or illegality of the bonds, the company should be here to defend them, because the county hold their stock in the road, and before we would cancel the bonds we would require the certificates of stock to be returned. But the bonds are not to be cancelled, except with the consent of the holder, and therefore we see no defence which the company could properly take in this suit. It is a controversy between the

[County of Armstrong *v.* Brinton.]

makers and the holders of the bonds, and as the essential fact upon which it turns, the price at which the bonds were bought by the holder, is admitted of record, the omission to sue the company is immaterial.

Still less important is the absence of interrogatories. They are a privilege of the plaintiff, but no necessary part of the pleading in an equity suit. The other causes of demurrer have been sufficiently answered already.

The learned judge dismissed the plaintiff's bill principally on the ground that it was a bill for the rescission of the contract of subscription, and without proof of fraud, or return of the stock, or making the company a party, such a decree ought not to be made. Undoubtedly. But while that decree was properly refused, a decree to restrain proceedings on the bond might well be made under this bill, and such conditions imposed upon the plaintiff as to compel the party seeking equity to do equity. Having sufficiently indicated the decree which we think ought to have been made, we reverse the decree below, and remand the record for further proceedings.

Decree accordingly.


Concurring opinion by

THOMPSON, J.—I concur in the opinion of the chief justice. The doctrine of this court in Thomas *v.* The Commissioners of Allegheny County, 8 Casey 265, repeated in Diamond *v.* The County of Lawrence, 1 Wright 353, and now practically applied, is, that municipal bonds payable to bearer, are not to the full extent commercial paper. "The seal spoils that," we said on a former occasion, and that this is true by the law-merchant, no lawyer can doubt. That other courts have held this specialty quality to be merged by the *current* term "*bearer*," is true ; but this is an innovation demanded perhaps by the times and changes in business, rather than evidence that such has always been the law, no candid mind will deny. We have not adapted the rule in its application to municipal bonds, a temporary and unfortunate expedient, as we all know, not again to be repeated in this state ; but as to the bonds of private corporations, we have as yet not had the point before us. The case of Beaver County *v.* Armstrong, 8 Wright 63, does not conflict with the doctrine of the cases cited. The only point in that case was, whether interest on over due interest-warrants or coupons was usurious. We decided that it was not. The principal argument was, that interest upon interest was not allowable ; not that the full amount of the coupon was not due, because the bonds had been sold below a fixed limit. That was not in the case. Authorities are referred to, it is true, to show the rule to be different in other states from ours on the question of complete negotiability, but that was not

the point of the case, nor was the fact doubted by any of us, or denied in any of the cases above referred to. The important question decided in that case has, in my opinion, no relevancy to that decided in this, and the case no authority against the rule in this.

Concurring opinion by

READ, J.—I concur in the conclusion arrived at by the chief justice in this case, but I do not agree with so much of his reasoning as conflicts with the decision of this court in The County of Beaver *v.* Armstrong, 8 Wright 63. It appears to me that, under the circumstances of this case, the same result must have followed if these bonds had been promissory notes or bills of exchange, and I therefore consider what is contrary to the last decision of this court as extrajudicial, because unnecessary.